**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | | |
|---|---|---|
| Hytto Pte. Ltd. and Danxiao Information Technology Ltd.,<br>Plaintiffs,<br>v.<br>Eddy JD Olivares II,<br>Defendant. | : | Docket No.: 2:25-cv-00576-KCD-NPM |

## AMENDED VERIFIED COMPLAINT

Plaintiffs Hytto Pte. Ltd. and Danxiao Information Technology Ltd. ("Plaintiffs" or "Lovense"), by and through their undersigned counsel, bring this Amended Verified Complaint against Defendant Eddy JD Olivares II ("Defendant") for defamation, business disparagement, libel per se and tortious interference, and allege as follows:

## PRELIMINARY STATEMENT

1. This is an action arising from Defendant's unlawful campaign of defamation, business disparagement, and tortious interference. After voluntarily resigning from his employment with Plaintiff Danxiao Information Technology Ltd.

in 2017 in breach of his employment agreement, Defendant began, in 2025, to publicly and falsely claim co-founder status, ownership rights, and control over Plaintiffs' intellectual property. Defendant has published numerous false and disparaging statements about Plaintiffs and their executives and interfered with Plaintiffs' business relationships. Plaintiffs seek injunctive relief, compensatory and punitive damages, attorneys' fees, and all other relief the Court deems just and proper.

## PARTIES

2. Plaintiff Hytto Pte. Ltd. ("Hytto") is a corporation organized under the laws of Singapore, with its principal place of business in Singapore. Hytto is the owner of the Lovense brand and its related intellectual property. It has operated as a U.S. facing entity for the Lovense brand and has conducted substantial business in the United States from 2013 to the present, including during the period from 2015 to 2017 through its former U.S. subsidiary, Hytto Inc.

3. Plaintiff Danxiao Information Technology Ltd. ("Danxiao") is a corporation organized under the laws of the People's Republic of China, with its principal place of business in Guangzhou, China. Danxiao was Defendant's employer during his tenure with the company.

4. Defendant Eddy JD Olivares II is an individual residing in Naples, Florida, within the Middle District of Florida. Defendant was employed by Danxiao from 2014 to 2017.

## JURISDICTION

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between citizens of a foreign state (Plaintiffs) and a citizen of a U.S. state (Defendant), and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district.

7. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, including Defendant's publication of defamatory statements and Defendant's tortious interference.

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(3), in that Defendant Mr. Olivares is subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

# FACTUAL BACKGROUND

## A. Defendant's Employment

9. Defendant was hired by Plaintiff Danxiao Information Technology Ltd. ("Plaintiff" or "Danxiao" or "Company") on or about July 1, 2014 in the position of Marketing Director.

10. Defendant entered into an employment agreement with Danxiao at or around the same time. Danxiao also applied for and sponsored the Defendant's work visa annually throughout the period of his employment with the Company.

11. Defendant was not a founder or co-founder of either Hytto or Danxiao. At the time Defendant was hired by Danxiao, Danxiao had already been in existence for 3 years.

12. In or around July of 2016, Defendant entered into an Equity Incentive Plan ("Equity Agreement") with Danxiao.

13. The Equity Agreement stated that Defendant would be permitted to purchase certain equity in Lovense starting in January 2019 only if he remained employed with Lovense through December 31, 2018.

14. On August 23, 2017, Defendant posted a public message in a company group chat informing the Company and its employees that he was terminating his employment with the Company. Defendant then immediately ceased his employment without following the resignation procedures in his employment

agreement which required him to give 30 days' written notice or pay a termination fee equivalent to one month's basic salary in lieu of said notice.

15. On September 7, 2017, Defendant confirmed his resignation when he sent an email to Huiyun Su ("H. Su") stating, in part, "I apologize for leaving in an irresponsible way…but things have been building up for quite some time." *See* Doc. 9-1, Exhibit A, Email from E. Olivares to H. Su dated September 7, 2017.

16. In October of 2017, Defendant attempted to block the company's access to its own bank accounts with the apparent intention of threatening the company and Defendant sent aggressive emails to Mr. Liu, the company's Chief Executive Officer and owner, related to same.

17. On November 14, 2017, Lovense, via counsel, sent a letter to Defendant acknowledging and confirming his resignation from employment on August 23, 2017 and the end of Defendant's relationship with Lovense. *See* Doc. 9-2, Exhibit B, Letter from P. Jones to E. Olivares dated November 14, 2017.

18. In November of 2024, seven (7) years after the relationship between Lovense and Defendant ended, Defendant sent correspondence to Lovense which included allegations related to the Equity Agreement and other purported unlawful actions of Lovense in an attempt to coerce Lovense into providing him with compensation that was not owed to him to resolve the purported disputes ("November 2024 letter").

19. In that correspondence, Defendant stated "The actions described above, including the unilateral termination and failure to honor the shareholder agreement, constitute clear violations of the fiduciary duty owed to me as a co-inventor and future shareholder. These breaches not only harmed my financial interests but also disregarded the protections meant to ensure my long-term success within the company."

20. However, Defendant failed to address the fact that he is the one who ended the employment relationship and that he did so by way of a message to many people within the company on August 23, 2017.

21. While Defendant may regret his decision to resign his employment prior to the date he was able to purchase equity in the company under the Equity Agreement, there is no evidence that Plaintiffs acted in bad faith nor that they engaged in any violation of the Equity Agreement.

22. In addition to the above, Defendant's November 2024 letter and attachments indicate that Defendant remains in possession of over 9,000 company files.

23. Based on Lovense's investigation into the contents of these files, they include technical product design information including related to future products, research and development information, software and firmware specification,

customer/distributor lists and product order histories, as well as pricing, margin, sales and marketing information of Lovense.

24. Defendant obtained access to these documents by virtue of his employment with Danxiao and his access and use were limited to legitimate company purposes during his employment.

25. These files are the property of Plaintiffs.

**B. Defendant's Unlawful Conduct**

26. Beginning in January 2025, after not receiving a response from Lovense satisfactory to Defendant's demands, Defendant began a campaign of defamation, libel per se and business disparagement against Lovense on multiple social media platforms. *See* generally, Docs. 9-1-9-44; Exhibits C-RR.

27. In addition to the unlawful defamation, libel per se and business disparagement, Defendant also tortiously interfered with various of Lovense's business relationships, employment relationships and contracts with business partners. *Id.*

28. Below is a sampling of many of the wrongful communications, posts and comments Defendant made between January 2025 to present related to Lovense.

**I. <u>Reddit</u>**

29. Defendant's Reddit handle/username is/was "Lovense_Co-Founder."

30. On January 24, 2025, Defendant posted on Reddit "I am Co-Founder of LOVENSE, AMA." *See* Doc. 9-3, Exhibit C.

31. Defendant made a detailed post on Reddit related to his alleged history with Lovense that contained many false statements:

> In mid-2014, I joined a small, fledgling Chinese startup consisting of 4 software developers and led them to become LOVENSE, the global powerhouse you all know and love (or hate).
>
> Before me, my co-founder Dan Liu had a couple of failed projects – all under LOVENSE's parent company, Guangzhou Danxiao Information Technology. He pivoted to sex tech (w/Max and Nora) shortly before I arrived and he didn't even trademark "LOVENSE" until after my interview and he heard my vision for the brand lol.
>
> The real story of LOVENSE is much different then [sic] the public version they spew (started in 2010, based in Singapore, etc.), so that is one reason I'd like to do this AMA.
>
> Would you believe I had to fight to create Lush and have it come out under the LOVENSE brand? Before I was forced out, I led product development and successfully launched Lush, Hush, Ambi, Domi, Edge and Osci…so I can provide insight into all those designs and some of their new designs as I started development on a couple. Despite me successfully launching 4 innovative designs in my final year, it took LOVENSE about 3 years to launch their next product after I left- a testament to my role in product development.
>
> Besides leading countless other areas of the company, most importantly, I am responsible for the company's first 6 patents, one of which enables them to dominate the cam industry. (and created their insane growth trajectory without spending anything on marketing).
>
> Needless to say, LOVENSE, which is now valued at roughly a billion dollars, wouldn't be the same without me. There is a 95%+ chance the company would have quickly failed, like LovePalz- the product which my co-founder Dan Liu copied (when he launched Max and Nora).

> Unfortunately, instead of celebrating my accomplishments, the company is now trying to erase my significant role from their history. It was bad enough and depressing that I was forced out and given $0 but altering 7 year old articles crosses a line. This is another reason I would like to do this AMA.
>
> I would love nothing more than to tell my truth and answer any questions about the early days of LOVENSE, sex toy development, the adult industry, general business questions, startups, working in China, etc…so AMA =)
>
> …
>
> *See* Doc. 9-4, Exhibit D.

32. Defendant posted, in part, on Reddit "I am first named inventor for their first 6 patents, led product development of first 6 of 8 products- all still sold today, responsible for the ICONIC product they still sell today, had a shareholder agreement, etc…" *See* Doc. 9-5, Exhibit E.

33. Defendant also posted on Reddit "…Since the company started, they have spent very little on actual marketing campaigns – both me and COO after me had no proper budgets allocated lol. I literally spent close to $0 to get the company from 150K in revenue to over $25 million+ in sales…and after that, it just kept snowballing higher, without any marketing focus, cause it's on all those camsites. Very different than most sex toy companies…." *See* Doc. 9-6, Exhibit F.

34. In response to a question "What's been the toughest moment for you while building your startup?", Defendant responded "Getting unilaterally terminated, which was against my shareholder agreement". *See* Doc. 9-7, Exhibit G.

35. In response to a question from a Reddit user, "How do you feel about lovesenses [sic] numerous data privacy issues?" Defendant responded:

> I don't recall any major privacy issues in my time there besides the Forbes mess I had to deal with (first major lawsuit was just after me). I trusted my co-founder to have great, stable and secure tech as he was CTO and it was his main responsibility. And his software team grew to about 10 or so before I ever hired one worker to help me, so I knew he had the resources…
>
> Given the above and the fact that the software team is even larger now, the only way I can describe Lovense having numerous data privacy issues is "very disappointing". I would hope Lovense also feels disappointed in the privacy issues- no one should be proud of that."
>
> *See* Doc. 9-8, Exhibit H.

36. In response to a question about customer service, Defendant responded:

> Sad to hear this. I was personally answering most customer emails for the first 2 years- literally every single day. I couldn't trust anyone else to do it well. It was the first department I formed to help me ease my workload and they are probably still using the reply templates I wrote lol…
>
> Being based in China, it is hard to even hire employees willing and capable to help and I imagine their workload is very high these days- that may be causing some of the issue/strain on CS side. Not sure who head of customer service is now, but when I left, we had a good and capable team.
>
> *See* Doc. 9-9, Exhibit I.

37. In response to a question about the type and quality of the silicone being used for Lovense products, Defendant responded: "I can only speak to the products during my time, but when i arrived, quality or quality control wasn't a priority. They

were software developers- and that's all they really thought deeply about. I was the one who pushed for using high quality silicone and (thankfully) that became a pillar of our products…I'm sorry I can't speak in detail about the type being used." *See* Doc. 9-15, Exhibit O.

38. In response to a question "Do you know anything about corners getting cut, quality being sacrificed to save money or anything?", Defendant responded:

> "I personally did my best to keep quality up and never cut corners. There is a challenge with manufacturing in China, because you can only trust our manufacturing partner so much (this is for all industries)…THEY USUALLY try to cut corners, to make more money without you knowing the quality decreased.
> I was denied the ability to build a relationship with the factory and that became a big issue for me over the years. My co-founder was solely responsible for this relationship during my time there. I found out about any quality issues by personally checking batches AFTER the products left the factory, instead of before…and then pushed for improvements if needed. Whether they still care as much or have a much better process today is beyond my knowledge." *See* Doc. 9-16, Exhibit P.

In response, Reddit user K_ir_A wrote:

> "…It's very depressing to hear how little the others you have worked with care about the quality of the products, I was mostly looking at Lovense because I wanted to try linking the toys with games like the sims which other brands don't really have the ability to. Thank you for at least trying to push for better quality but based on their care and ethics Lovense probably isn't gonna be the brand I'll be going for although probably most (big) brands are similar unfortunately." *Id.*

39. Defendant also posted:

> …In my co-founder's defense he thought he was hiring me to market all is [sic] project ideas. His developers were focusing on developing a camsite (was very strange to me, because that is highly illegal in China) and he also was prepping to launch a "smart" cock ring that recorded your sex data and put it on FB.
>
> Needless to say, those 2 projects never came out, but I had to fight to not launch them. The road to success was not easy for me and I think some of those early fights created some tension/issues that persisted until I was forced out. *See* Doc. 9-18, Exhibit R.

40. In response to a question about how Lovense has made rapid progress in the industry, Defendant responded:

> It's the patent. Chaturbate alone gets about 500m views a month and we are all over it because of the patent, without any competition. Given this, the 'organic' growth has been absolutely insane. Both me and the COO after me were never even given any marketing budget. I really bootstrapped this to 25 million+ alone and then it kept snowballing from there.
>
> I would be absolutely shocked it [sic] they spend even $250k on marketing per year.
> And, for history's sake, I came up with the idea of the patent by watching camsites, scouring model for a like AmberCutie and Milovana and trying to understand painpoints of the industry…there was a super popular product called OhMiBod and it was essentially scamming customers because the tip sounds didn't correlate with the toy reaction properly (models were straight up faking).
> I thought if we could connect tip amount to vibration level, we could help the models make more money and the customers would have a better experience. Even if all the models could do was make the minimum 'tip to

> vibrate' 2 tokens instead of 1, they could instantly double their earnings (at least that was my thinking).
> And when the tech team figured out how to do it, the first thing I did was determine patentability and we filed the application…
>
> *See* Doc. 9-20, Exhibit T.

## II. AmberCutie's Forum

41. Defendant posted numerous unlawful posts on AmberCutie's Forum engaging in defamation, libel per se and business disparagement in addition to tortious interference.

42. The following are a number of Defendant's wrongful posts:

a. "…Current CEO and other co-founder was/is the tech lead. I really wonder how hard is he working on his apps. I won't comment any further since this is an ongoing legal dispute =) Actually, I've already probably said way too much…may have to stop commenting. I need a lawyer to tell me what to do lol. For sure, I will always update as I can." *See* Doc. 9-21, Exhibit U, dated January 14, 2025.

b. "…I will definitely do some interesting things if/when I get my patent rights back. When creating the brand vision I vowed to never to [sic] just copy other company's designs and "add bluetooth"…and let's just say, I really don't like what I see has happened to the brand. FYI, the patent you attached is for the Lush design (I have 6 US patents and 1 EU patent)…this is the key patent, for anyone interested…" *See* Doc. 9-22, Exhibit V dated January 14, 2025.

c. "Hello all! I am the inventor of the infamous "tip-based vibrations" patent…This is an ongoing legal issue, so I really can't say everything I want. I can answer select questions and will update regarding this dispute when possible…" *See* Doc. 9-23, Exhibit W dated January 14, 2025.

d. "Unfortunately, there are so many attached pieces of evidence it's hard to put it here or somewhere else. But basically I claim I was wronged – never properly compensated for any of my inventions or contributions. I recently realized my patent rights (among other rights) and raised this dispute with Lovense and my co-founder. They responded by denying all claims and contacting 2 websites to remove 'co-founder' attributions to my name…" *See* Doc. 9-24, Exhibit X dated January 14, 2025.

e. "I joined before they even hit $150k in sales and had two crappy products (original max and nora). I designed and launched Lush, Hush, Edge, Ambi, Osci and Domi. They've made about $800,000,000 in sales, mainly due to my contributions and how my patent protects the company from competitors (while also giving free marketing for the company on camsites)…I am hoping my legal battle provides me justice and I can fully tell my story. It's been a long, depressing 7 years of not knowing how to deal with this." *Id.*

f. "Regarding light up toys – To be fair, my co-founder Dan suggested we put a light on Domi. I personally hated (and still hate) the idea of light up toys, but it made sense functionally (to confirm the tip made the toy function) so I threw him a bone and agreed to include it in the product. That was years ago, so I'm not sure how Kiiroo could protect that idea." *See* Doc. 9-25, Exhibit Y dated February 17, 2025.

## III. <u>Twitter</u>

43. Defendant posted numerous wrongful posts on Twitter engaging in defamation, libel per se and business disparagement in addition to tortious interference.

44. On January 14, 2025, Defendant posted, among other posts:

a. "Fact #1 – I co-founded @Lovense with Dan Liu and was responsible for the foundational patents, among countless other things."

b. "Fact #2 – The truth about the company's foundation is largely unknown. My significant contributions have been unrecognized and remain uncompensated."

c. "This thread is complete. It was posted due to the ongoing spoliation of evidence by @Lovense and their lack of confirmation that they will abide by pre-arbitration/trial good faith expectations. Due to media outreach and alterations by @Lovense, I feel that I have no choice but to publicize these specific aspects of my case. @Lovense, please stop focusing on attempting to re-write 7 year old history and engage with me in good faith."

*See* Doc. 9-26, Exhibit Z.

45. In response to Defendant's comments related to the quality and quality control of Lovense products which were untrue, a third-party and potential Lovense consumer responded: "...It's very depressing to hear how little the others you have worked with care about the quality of the products, **I was mostly looking at Lovense because I wanted to try linking the toys with games...Thank you for at least trying to push for better quality but based on their care and ethics Lovense probably isn't gonna be the brand I'll be going for...**" *See* Doc. 9-27, Exhibit AA (emphasis added).

46. Defendant posted the following on February 25, 2025:

"I just found out that @Lovense dissolved Hytto Inc on November 28, 2024.
Yes, the same US entity that nearly $1,000,000,000 has flowed through from 2014 through 2024.
Yes, the same US entity that I set up weeks after joining the company and was Treasurer of from inception until my unilateral termination in 2017.

Yes, the same US entity that is in my (breached) shareholder agreement.
Yes, the same US entity that my dispute is mainly about…someone refused to show the Treasurer the US tax returns, right? ….”
*See* Doc. 9-28, Exhibit BB dated February 25, 2025.

47. Defendant posted the following on February 27, 2025:

a) “Another retaliatory action today.
Got me silenced on yet another public forum.
Why would @Lovense threaten @ambercutieforum with a lawsuit? Why not threaten me with legal action?
Can any legal professionals tell me if this is hurting or helping my case?” *See* Doc. 9-29, Exhibit CC dated February 27, 2025.

b) “What does @Lovense staff think of its CEO, Dan Liu?
Luck doesn’t build companies. Luck runs out. I bet Dan Liu’s legacy will not be ‘the luckiest man in the world’ …
When will his public image change? Will he become more known, worldwide? For what?...” *See* Doc. 9-30, Exhibit DD dated February 27, 2025.

c) “Marketing @Lovense after I left…Now it makes total sense how they grew super fast without me- they took pictures with fruit in hotel rooms!!...If you didn’t know, Lovense has nearly $200 million in annual sales…” *See* Doc. 9-31, Exhibit EE dated February 27, 2025.

48. Defendant also posted the following:

“Who said things are cheap in China?

I wonder how much @Lovense is paying for their legal counsel.
Their genius retaliatory actions so far:

1. Dissolved the US company involved in my disputes (nearly 1 billion flowed through it)

> 2. Changed my old @LovenseSales twitter profile to remove ‘co-founder’ from the bio
> …
>
> 6. Transferred my EU patent rights (using the 7 year old assignment I’m disputing)
>
> 7. Threatened @ambercutieforum with a lawsuit due to me posting about Lovense there.
>
> Meanwhile, what has Dan Liu publicly said about patent and other disputes?”
>
> *See* Doc. 9-32, Exhibit FF.

49. On April 30, 2025, Defendant appeared to make threats to Plaintiffs: “…@Lovense, Dan Liu and Huiyun Su are definitely not ready…” *See* Doc. 9-33, Exhibit GG.

50. In addition, on May 10, 2025, Defendant posted additional threats:

“…@Lovense and the camming industry will never be the same after I’m done…”

*See* Doc. 9-34, Exhibit HH.

51. On May 12, 2025, Defendant again continued to post defamatory statements about Mr. Liu:

> “…Why would this lawyer take my case? Someone go ask CEO, Dan Liu, because I bet he told employees that my case is frivolous…He’s really gotta stop lying. That is what got him in this position!...” *See* Doc. 9-35, Exhibit II.

52. Defendant continued to post defamatory, libelous and disparaging content about Plaintiffs, including the following:

> "Memorial Day Weekend…a time when @Lovense can honor soldiers- a group of people that the brand and products can actually help. I remember getting customer emails from service men and woman saying our products helped. It was a key demographic I wanted to help.
> And what does @Lovense do for this holiday? Organize and heavily promote a digital orgy using furry porn artists lol
> Even more funny that it is a Chinese company running this behind the scenes. Back in 2019 they couldn't even get Chinese patents approved because the underlying tech was considered to be 'violating public order and morality…
> Imagine what government agencies will do/think when they realize most of this digital orgy is being orchestrated from Guangzhou, China…"
>
> *See* Doc. 9-36, Exhibit JJ.

## IV. <u>LinkedIn</u>

53. Defendant posted numerous wrongful posts on LinkedIn engaging in defamation, libel per se and business disparagement as well as tortious interference.

54. Defendant's LinkedIn "Experience" section states the following:

> Dan Liu claims to be a solo founder of Lovense. When I joined his fledgling start up, he had a poorly outsourced design of Max and Nora with a bad app and user experience. There were 2 software developers, 1 graphic designer and Dan's role was mainly "being the boss".
>
> For years they tried launching non-sex toy projects but failed. Max and Nora was a copycat of a startup called LovePalz. The company saw some initial success, but no one was even interested in sex toys. FOR YEARS, no one in the company besides me was even willing to try or discuss the products 😂
>
> Our main competitor had plenty of money, market influence and widespread distribution due to Fleshlight being their partner. Meanwhile I had no resources and no guidance/support.

When I joined, Dan Liu's genius next moves included:

1. Hi Pleasure - An adult camsite, which is illegal in China
2. Bandnana - A cock ring that recorded your sex data and posted it to FB (you compete against everyone in the world)

He had all employees work on his illegal Chinese cam site for over a year. I had to fight him for months before he gave up on these ideas.

I did everything and anything I could to make Lovense a success, and I earned the co-founder title (a title recognized internally and externally). No other early employees took on additional roles.

I am the one who figured out the appropriate next product- Lush. The Camsite Tipping Feature (US Patent #9762515) was my idea and I pursued the patent application to protect it. I designed and successfully launched Lush, Hush, Osci, Domi, Edge and Ambi.... all while doing COUNTLESS other things.

How much help did I have? What specific tasks did Dan Liu do to build and grow Lovense? How many early employees were promised good pay and equity, but never got it?

Does US Patent law or written agreements mean anything to Dan Liu?

How long until I get what I deserve? How many lawyers will I need?

*See* Doc. 9-37, Exhibit KK.

55. On May 13, 2025, Defendant posted the following, in part, on LinkedIn:

"…Imagine being largely responsible for a company making half a billion in profits and then its employees help retroactively remove your role from public company history. In my experience working with him, Dan L. was always bad at acknowledging and compensating employees, but this crosses the line of what is

> acceptable. He allowed this? Or worse- he personally requested it try to be changed? I hope he is treating current employees better. They deserve a good leader."
> *See* Doc. 9-38, Exhibit LL.

56. In response to another user's comment, Defendant stated the following, in part:

> "Honestly kinda surprising they would treat you poorly, as India is a very challenging market and I see you've been a fantastic partner. My experience with adult biz news, is that they do not care about issues like ours, as they don't want to ruin the relationship with Lovense…I sincerely hope this changes and they help you expose whatever is going on." *See* Doc. 9-39, Exhibit MM.

57. One business partner/distributor of Lovense posted the following on one of Defendant's LinkedIn posts:

> "Eddy - You do NEED to speak up, to XBIZ, EAN as well as StoreErotica. Lovense will be representing at EroSpain, I plan to speak up about our experience with Lovense. You may consider that."
>
> In response, Defendant commented:
>
> "Raj Armani I did reach out to XBIZ, EAN and some mainstream news. No one cares... so far. I am just getting started. I am selling every asset I own to fight Lovense in multiple jurisdictions. I will happily spend every last dollar pursuing my rights, for years if I have to. Good luck getting coverage! I admire your willingness to expose what they're doing to you...and not just bow down. You will be helping a lot of other distributors and retailers by sharing your experience." *See* Doc. 9-40, Exhibit NN.

58. On May 19, 2025, Defendant posted the following on LinkedIn:

> "…How did Lovense conquer the adult toy industry while spending almost nothing on marketing/advertising AND treating partners/employees poorly? According to public data, sales are now roughly $200,000,000 annually…The rapid and ongoing growth is clearly due to tip-based vibrations, protected by US Patent #9762515. Each model's stream is like a long, extremely engaging advertisement for Lovense products…Under what conditions did Lovense obtain all my patent rights? Were any conditions honored? Did I receive even $1.00? What will 12 American jurors think about all of Lovense's recent retaliatory actions against me? How much would Lovense's $200 million in annual sales drop if those camsite tipping patent rights are lost? If Lovense lost their patent rights, who would retain ALL patent rights for tip based vibrations? Me….The most important question is…When I reclaim full patent rights, should I license to Lovense's competitors or start a new company?..."
>
> See Doc. 9-42, Exhibit PP.

59. Defendant posted the following defamatory and disparaging statements about Lovense and Mr. Liu:

> "Screenshot below details how Dan Liu, the CEO of Lovense, directed an employee to impersonate me and attempt bank fraud on Lovense's US bank account. I only found out about this recently.
>
> I always acted in good faith and I assumed my co-founder/co-inventor did as well. I was too busy building the company and didn't realize the level of betrayal I was dealing with. I partially blamed myself for the unreconcilable fallout between us and fell into a deep depression for many years.
>
> Co-founder disputes are a normal part of #startups- especially high growth ones. What's not normal is breach of fiduciary trust, breach of fiduciary duty, breach of contracts, willingness to break serious laws and countless retaliatory actions 7 years after the initial dispute.

Since my recent notice of dispute in November 2024, I have connected with current and past Lovense employees and heard their stories. There is a clear and ongoing pattern of behavior by the CEO. I am actually extremely lucky that I still have legal recourse and have plenty of funds to pursue all claims.

I could stay quiet as my lawyers prep, but I refuse to be intimidated by Lovense's retaliatory actions and attempts to silence me. I will continue to speak out as much as possible before, during and after my lawsuits.

I share details with the hope that everyone in the industry uses caution when working with Lovense. If the CEO is treating employees so poorly, we can only imagine what he is willing to do to everyone else.

And unfortunately, many current Lovense employees seem to follow his questionable orders without any independent thought (like contacting Reddit to ban my account, asking multiple media outlets to change 7 year old articles about me, threatening lawsuits against forum owners who allow my posts, etc.).

Is the designer and marketer of many of the best-selling sex toys in the last decade not allowed in this industry anymore? No one cares this is happening? I wonder if XBIZ, ETO Magazine, YNOT, AVN, StorErotica and others have been asked by Lovense not to speak on/to me?

It's very sad and frustrating that new Lovense employees are benefitting from my patents and foundational contributions, while at the same time actively hurting my professional image and opportunities. When will it end?"

*See* Doc. 9-43, Exhibit QQ

60. Defendant posted the following on LinkedIn tagging both Lovense and Mr. Liu in his post:

> I cannot control other people's opinions, based on their own experience working alongside Dan L. at Lovense.
>
> To be clear, this opinion is from an employee I never even met. I shared this on X because I thought it was funny and it loosely supported my claims, but I should clear Dan's name!
>
> For the record, let me defend my co-founder, Dan Liu...I admit I did not do EVERYTHING.
>
> But what did I do? And what did Dan do? Why is Dan Liu trying to retroactively steal credit for my work?
>
> Lucky for me, Dan outlined his responsibilities during our final dispute. I will clear his name and explain exactly what he is responsible for in upcoming posts.
>
> *See* Doc. 9-44, Exhibit RR.

61. Defendant tagged or included both Lovense's and/or Mr. Liu's usernames/social media handles in many of the above referenced posts, thereby ensuring that Lovense's customers, business contacts and the public in general would see the defamatory, disparaging and libelous posts and comments therefore tortiously interfering with Lovense's business relationships, economic advantages and contracts.

62. Defendant also tagged or included various media outlets in some of his defamatory and disparaging posts.

## V. Direct Communications

63. In addition to the above public statements, Defendant also targeted communications to various Lovense business partners which were wrongful:

a. On November 11, 2024, Defendant emailed a former distributor of Lovense who has since been acquired by one of Lovense's largest distributors. Defendant stated in the email that he is "one of the co-founders of Lovense" and "I have something very interesting coming up in the near future. And I may need a bit of your help…hoping for, at least, an initial response for now."

b. On November 24, 2024, Defendant emailed one of Lovense's United States retail buyers stating that he is "one of the co-founders of Lovense" and "I have something very interesting coming up in the near future. And I may need a bit of your help…hoping for, at least, an initial response for now." This email was sent by Defendant on or around the date he sent his initial demand letter to Lovense regarding his alleged dispute with Lovense.

c. Defendant tagged a Lovense distributor, in a post regarding Lovense. Prior to tagging the distributor in his LinkedIn post, Defendant had viewed the LinkedIn profile of the General Manager of the distributor. After tagging the distributor in his post, the General Manager and other employees of the distributor reviewed Defendant's posts on LinkedIn related to Lovense. The

General Manager indicated to Lovense that he and members of his team were concerned about whether Lovense was a brand they should be associated with given Defendant's extremely negative posts. The General Manager stated that he also had concerns that customers may rely negatively on Defendant's negative content about Lovense when making purchasing decisions.

d. Defendant also invited numerous employees of another Lovense distributor - the largest adult product distributor in Europe – to connect with him on LinkedIn. The company's Head of Purchasing was one of the individuals who Defendant added as a connection on LinkedIn. As a result of Defendant adding this individual and other employees of this distributor on LinkedIn, they have seen Defendant's negative posts about Lovense. The Head of Purchasing has raised concerns related to same to Lovense. The Head of Purchasing stated that he had concerns about the posts related to product quality and the generally negative nature of the posts made by Defendant.

64. Defendant has also messaged many past and current Lovense employees to discuss the dispute and to interfere with Lovense's employment

relationships with its current employees:

a. Defendant messaged Lovense's current Vice President of Software and Development, Jilin Qiu, and made threats to Mr. Qiu. Defendant told Mr. Qiu that if he cooperates with Lovense, he could get in trouble and that "You are putting yourself at risk by obeying and being involved" in an attempt to interfere with Lovense's employment relationship with Mr. Qiu.

b. Defendant messaged a former employee and attempted to interfere with a current employee's employment relationship and agreements with Lovense. Defendant asked the former employee to have his former colleague, a current employee, obtain Lovense's confidential information and trade secrets so that the current and former employees could disclose same to Defendant.

**C. The Truth About Defendant's Relationship with Lovense**

65. Defendant is not and was not a co-founder of Lovense. Prior to joining the Company, Defendant had worked continuously for many years as an English teacher.

66. Lovense was formed on June 2, 2011, by Dan Liu and Huiyun Su years prior to Defendant becoming an employee of the Company.

67. While Defendant was the head of marketing at Lovense during his employment, Defendant did not make any substantive technical contributions to any of the referenced products/patents and therefore did not lead product development for Lovense's "first 6 of 8 products" and was not "responsible for the ICONIC product they still sell today.".

68. Lovense's Hardware Product Director was responsible for the actual design of the above referenced products.

69. Defendant was not solely responsible for any of Lovense's patents. Lovense is the applicant and the duly granted lawful owner of all patents, trademarks, and other intellectual property rights, all of which are legally owned by the company.

70. There is not and was not a "95%+ chance the company would have quickly failed..." without Defendant. Defendant was with the Company for only three years, and the Company has continued to grow significantly after his departure reaching approximately $100 million dollars in revenue in 2024.

71. It is untrue that since Lovense started, Lovense has spent very little on marketing. Lovense spends a substantial amount on marketing each month through Google advertising and other marketing avenues.

72. Defendant did not get Lovense to over $25 million in sales.

73. Defendant was not "unilaterally terminated."

74. Defendant was not "forced out and given $0."

75. Lovense did not terminate Defendant's employment in violation of his Equity Agreement.

76. Defendant resigned voluntarily from Lovense on or about August 23, 2017.

77. It is untrue that no one at Lovense could be trusted to respond to consumer emails.

78. It is also untrue that Lovense struggles with hiring employees willing and capable because they are based in China.

79. It is untrue that Lovense was not concerned with quality or quality control of its products at any time.

80. Defendant's comments about quality control and quality control processes are untrue.

81. Defendant was not promised equity in his first interview with Lovense.

82. Defendant's comments about Lovense's development of an illegal website or engaging in other illegal conduct are untrue.

83. Defendant's comments about Mr. Liu's conduct related to various topics are untrue.

84. Defendant was aware or should have been aware that he was engaging in unlawful behavior as indicated by his statement "Actually, I've already probably

said way too much…may have to stop commenting. I need a lawyer to tell me what to do lol." *See* Doc. 9-45, Exhibit SS.

**D. Lovense Takes Action**

85. On May 28, 2025, Lovense, via counsel, sent a cease and desist letter to Defendant related to the above referenced conduct. *See* Doc. 9-46, Exhibit TT, Letter from R. Ampudia and C. Kelly to E. Olivares dated May 28, 2025.

86. The letter required that Defendant respond and indicate he would cease and desist from engaging in unlawful conduct by June 11, 2025. *Id*.

87. The letter required that Defendant return all Lovense property, including physical documents or electronic files taken by him or otherwise in his possession.

88. Despite this demand, Defendant has not returned Lovense's documents or electronic files in his possession.

**<u>COUNT I – DEFAMATION</u>**
**(Against Defendant Mr. Olivares)**

89. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

90. Defendant published numerous false statements of fact about Plaintiffs and their executives as set forth more fully above, including but not limited to:

a. Falsely claiming to be a co-founder of Lovense;

b. Falsely claiming to have been solely responsible for Lovense's product development and patents;

c. Falsely accusing Plaintiffs and their executives of fraud, unethical conduct, and illegal activity;

d. Falsely asserting that Lovense's products were of poor quality and lacked proper quality control.

91. These statements were published on public platforms including Reddit, Twitter, LinkedIn, and AmberCutie's Forum, and were directed at Plaintiffs' customers, business partners, and the general public.

92. Defendant also communicated directly to various third parties through private messages and published false statements about Plaintiffs to those third parties.

93. The statements were false, defamatory, and made with actual malice , with reckless disregard for the truth or, at a minimum, negligently.

94. As a direct and proximate result of Defendant's defamatory statements, Plaintiffs have suffered reputational harm, loss of business opportunities, and other damages in an amount to be proven at trial.

**COUNT II – BUSINESS DISPARAGEMENT**
**(Against Defendant Mr. Olivares)**

95. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

96. Defendant made false and disparaging statements, as set forth more fully above, about Plaintiffs' business operations, product quality, financial practices, and leadership, including but not limited to:

a. Alleging that Lovense engaged in illegal conduct;

b. Claiming and/or inferring Lovense's products were defective or poorly manufactured;

c. Claiming and/or inferring that Lovense's employees and business practices were subpar;

d. Suggesting Lovense's executives acted unethically or fraudulently.

97. Defendant made these false and disparaging statements and others on public forums and made these and other false and disparaging statements in private communications to third parties.

98. Defendant made these statements with the intent to harm Plaintiffs' business reputation or with reckless disregard for the consequences.

99. Defendant's conduct has caused concrete and measurable harm to Plaintiffs' business relationships and reputation. He has stated that he shared Plaintiffs' information with industry peers and media outlets, seriously damaging Plaintiffs' brand reputation. Defendant's public statements have been viewed and engaged with by individuals in the industry, including at least one distributor who

expressed dissatisfaction with Plaintiffs and indicated an intent to speak publicly about their experience. These statements have caused reputational harm and risked disruption to Plaintiffs' business relationships. Defendant has also approached current employees in an effort to expose and undermine Plaintiffs' ongoing marketing strategies, posing a continuing threat of competitive harm.

100. As a direct and proximate result, Plaintiffs have suffered special damages, including lost business, reputational injury, and diminished goodwill.

**COUNT III – LIBEL PER SE**
**(Against Defendant Mr. Olivares)**

101. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

102. Defendant published written statements that falsely accused Plaintiffs and their executives of criminal, unethical, and incompetent conduct, including fraud, misappropriation, and poor product quality.

103. These statements were defamatory on their face and harmed the reputation of Plaintiffs.

104. The statements were published to third parties and were not privileged.

105. As a direct and proximate result of Defendant's libel per se, Plaintiffs are entitled to presumed damages, as well as actual and punitive damages.

**COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Defendant Mr. Olivares)**

106. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

107. Plaintiffs had valid and enforceable contracts with employees, distributors, and business partners.

108. Defendant knew of the existence of these contractual relationships.

109. Defendant intentionally and unjustifiably interfered with these contracts by:

a. Making false and disparaging statements about Plaintiffs and their leadership;

b. Contacting third parties to dissuade them from continuing their relationships with Plaintiffs;

c. Encouraging others to sever or alter their contractual obligations with Plaintiffs.

110. Defendant's public statements have contributed to reputational harm and have strained Plaintiffs' relationships with a number of business partners, creating a risk of business disruption.

111. As a direct and proximate result of Defendant's interference, Plaintiffs have suffered damages, including lost business, reputational harm, and disruption of contractual relationships.

## COUNT V – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Against Defendant Mr. Olivares)

112. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

113. Plaintiffs had valid and identifiable business relationships with customers, distributors, vendors, and other third parties.

114. Defendant had knowledge of these business relationships, including through his prior employment with Plaintiff Danxiao and his continued monitoring of Plaintiffs' operations.

115. Defendant intentionally and unjustifiably interfered with these relationships by making false and disparaging statements about Plaintiffs and their executives, and by contacting or attempting to contact third parties to dissuade them from continuing their relationships with Plaintiffs.

116. Defendant's interference was not privileged or justified and was undertaken with the intent to harm Plaintiffs' business interests.

117. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered damages, including lost business opportunities, reputational harm, and disruption of business relationships.

## COUNT VI – BREACH OF CONFIDENCE
**(Against Defendant Mr. Olivares)**

118. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein

119. During his employment with Plaintiff Danxiao, Defendant was entrusted with confidential and proprietary information, including internal business records, technical documentation, trade secrets, common law copyright protected information, product development strategies, sales strategies, marketing plans, customer/distributor lists, customer/distributor order information, pricing information, and financial data.

120. Defendant owed a duty of confidence to Plaintiffs, arising from his employment agreement and the nature of his position and the nature of the information accessed by Defendant in his position.

121. Defendant breached that duty by disclosing confidential and/or protected information to the public via social media and online forums, including Reddit, Twitter, and LinkedIn and in private communications with third parties.

122. As a direct and proximate result of Defendant's breach of confidence, Plaintiffs have suffered and will continue to suffer irreparable harm, including loss of competitive advantage, reputational damage, and economic loss.

123. Plaintiffs are entitled to all remedies available, including damages, equitable relief directing the return and deletion of Plaintiffs' property and

prohibiting further use or dissemination and the implementation of a constructive trust.

**COUNT VII – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Against Defendant Mr. Olivares)**

124. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

125. Defendant engaged in deceptive and unfair acts or practices in trade or commerce by wrongfully taking, retaining, and using Plaintiffs' property and internal business materials (including business records, customer and distributor lists, and sales and marketing materials) after the termination of his relationship with Plaintiffs, and by leveraging such property and materials in the marketplace in conjunction with false and misleading statements about his role, ownership, or control to solicit attention, cooperation, or advantage from Plaintiffs' customers, distributors, retailers, and other business partners.

126. Defendant's deceptive practices were likely to mislead consumers and market participants acting reasonably under the circumstances, to their detriment, including by falsely suggesting that Defendant possessed authority, ownership, or control with respect to Plaintiffs and their products, and by misrepresenting the quality, provenance, and rights associated with Plaintiffs' offerings.

127. Independently and alternatively, Defendant's conduct constitutes an unfair practice in that it offends established public policy and is immoral, unethical, oppressive, or unscrupulous, and it has caused, and is likely to cause, substantial injury to consumers and to business market participants that is not reasonably avoidable and is not outweighed by countervailing benefits.

128. Defendant's marketplace conduct includes: retaining and using Plaintiffs' internal business records, customer and distributor lists, and sales and marketing materials after termination; using that property and materials to target, contact, and influence industry participants; and pairing that use with deceptive public claims concerning his purported status and rights, thereby misleading third parties and distorting fair competition.

129. The foregoing acts and practices were not required or specifically permitted by any federal or state law and therefore are not subject to FDUTPA's "safe harbor."

130. As a direct and proximate result of Defendant's FDUTPA violations, Plaintiffs have suffered actual damages, including but not limited to actual loss of customers, harm to business relationships, loss of goodwill, mitigation costs, and other losses proximately caused by the unfair acts and practices, and will continue to suffer such damages absent relief.

131. Plaintiffs seek all remedies available under FDUTPA, including injunctive relief prohibiting further unfair acts, an order requiring the return and deletion of Plaintiffs' property and enjoining its use in the marketplace, actual damages, pre- and post-judgment interest, and reasonable attorneys' fees and costs pursuant to Fla. Stat. § 501.2105.

**COUNT VIII– BREACH OF CONTRACT**
**(Against Defendant Mr. Olivares)**

132. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

133. Defendant entered into a valid and enforceable employment agreement with Plaintiff Danxiao.

134. The agreement imposed certain obligations on Defendant, including that he provide 30 days' written notice prior to terminating the employment agreement.

135. Defendant breached the agreement by failing to provide the required 30 days' written notice prior to terminating the employment agreement.

136. Defendant is a Florida resident, and his breaches occurred in Florida.

137. As a direct and proximate result of Defendant's breach, Plaintiffs have suffered damages, including the payment for the 30 days' notice period and costs associated with mitigating the effects of Defendant's conduct.

**PRAYER FOR RELIEF**

138. WHEREFORE, Plaintiffs Hytto Pte. Ltd. and Danxiao Information Technology Ltd. respectfully request that this Court enter judgment in their favor and against Defendant Eddy JD Olivares II, and award the following relief:

a. Compensatory damages in an amount to be determined at trial;
b. Punitive and exemplary damages where permitted by law;
c. Preliminary and Permanent Injunctive relief enjoining Defendant from further tortiously interfering with Plaintiff's business relationships and contracts, prohibiting further breach of confidence, and prohibiting further defamatory, libelous or disparaging statements against Plaintiffs and their executives;
d. An order requiring Defendant to return all property, including but not limited to any and all hard copy and electronic documents, of Plaintiffs in his possession to Plaintiffs and to destroy same;
e. An order requiring Defendant to remove and rescind all defamatory, libelous or disparaging statements already published regarding Plaintiffs and their executives;
f. Attorneys' fees and costs pursuant to applicable law;
g. Pre- and post-judgment interest; and
h. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: December 4, 2025

RIMÔN, P.C.

/s/Ricardo A. Ampudia
Ricardo A. Ampudia, Esq., B.C.S.
FL Bar No. 124293
Tara L. Humma, Esq. (admitted *pro hac vice)*
**Rimon, P.C.**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Telephone: (202) 991-1516
ricardo.ampudia@rimonlaw.com
tara.humma@rimonlaw.com

*Attorneys for Plaintiffs*

**DECLARATION**
**Under 28 U.S.C. 1746**

I, Jinxin Pan, do hereby declare:

I declare under penalty of perjury under the laws of the United States of America that the foregoing Verified Complaint is true and correct.

Executed on December 4, 2025

Jinxin Pan
Jinxin Pan (Dec 4, 2025 23:02:11 GMT+8)

Signature

Name: Jinxin Pan