**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

Case No. 2:25-CV-576-KCD/NPM

HYTTO PTE. LTD., and DANXIAO INFORMATION TECHNOLOGY, LTD.,

Plaintiffs/Counter-Defendants,

v.

EDDY JD OLIVARES II,

Defendant/Counter-Claimant.
_______________________________________/

# ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant, Eddy JD Olivares II, pursuant to Rule 7(a)(2) and 8(b)(1) of the Federal Rules of Civil Procedure, files his Answer and Affirmative Defenses to Plaintiffs' Amended Verified Complaint (D.E. 92), counter-sues Plaintiffs Hytto Pte. Ltd. and Danxiao Information Technology, Ltd., and alleges:

## ANSWER

1. Denied.

2. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations regarding Plaintiffs' corporate structure and operations, therefore, denied.

3. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations regarding Plaintiffs' corporate structure, therefore, denied.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted that venue is proper, otherwise, denied.

8. Admitted.

9. Admitted that Defendant was employed by one or more of the Plaintiffs, otherwise, denied.

10. Admitted.

11. Denied.

12. Admitted.

13. The agreement speaks for itself. To the extent Plaintiffs misstate, miscite, or misrepresent the content of the agreement, such allegation is denied.

14. Denied.

15. Denied.

16. Denied.

17. Denied.

18. Denied.

19. The communications speak for themselves. To the extent Plaintiffs misstate, miscite, or misrepresent the content of the communications, such allegation is denied.

20. Denied.

21. Denied.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

29. Admitted.

30. Admitted.

31. Admitted as to posting on Reddit. Denied that any such statement was false, defamatory, or otherwise actionable.

32. Admitted.

33. Admitted.

34. Admitted.

35. Admitted.

36. Admitted.

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted.

41. Denied.

42. Denied.

43. Denied.

44. Admitted.

45. Denied.

46. Admitted.

47. Admitted.

48. Admitted.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Admitted.

55. Admitted.

56. Admitted.

57. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations regarding whether the third-party was a business partner or distributor, therefore, denied.

58. Admitted.

59. Denied.

60. Admitted.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. Denied.

82. Denied.

83. Denied.

84. Denied.

85. Admitted.

86. Admitted.

87. Admitted.

88. Denied.

89. Denied.

90. Denied.

91. Admitted insofar as statements were published, otherwise, denied.

92. Denied.

93. Denied.

94. Denied.

95. Denied.

96. Denied.

97. Denied.

98. Denied.

99. Denied.

100. Denied.

101. Denied.

102. Denied.

103. Denied.

104. Denied.

105. Denied.

106. Denied.

107. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations regarding Plaintiffs' alleged contracts with employees, distributors, and/or business partners, therefore, denied.

108. Denied.

109. Denied.

110. Denied.

111. Denied.

112. Denied.

113. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations regarding Plaintiffs' alleged

business relationships with customers, distributors, and/or vendors, therefore, denied.

114. Denied.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

119. Denied.

120. Denied.

121. Denied.

122. Denied.

123. Denied.

124. Denied.

125. Denied.

126. Denied.

127. Denied.

128. Denied.

129. Denied.

130. Denied.

131. Denied.

132. Denied.

133. Plaintiffs do not specify which "employment agreement," therefore, denied.

134. Plaintiffs do not specify which "agreement," therefore, denied.

135. Denied.

136. Denied.

137. Denied.

138. Any allegation of Plaintiffs' operative complaint not specifically admitted hereinabove is denied.

## PRAYER FOR RELIEF

Defendant seeks judgment in his favor against Plaintiffs, that Plaintiffs take nothing by way of their claims, that Defendant be awarded his costs of suit and attorneys' fees, and such other and further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

Defendant avers and asserts the following affirmative defenses. In asserting these defenses, Defendant neither expressly nor implicitly assumes the burden of disproving any element of any claim for which Plaintiffs bear the burden of proof as a matter of law. Defendant reserves the right to assert additional affirmative defenses and any counterclaims that were either inadvertently omitted or that become known as this action proceeds including those discovered during the course of discovery.

**Affirmative Defense No. 1: Truth**

Plaintiffs' claims are barred, in whole or in part, because the statements at issue are true or substantially true. The alleged statements concern Defendant's role, contributions, and experiences while employed by Plaintiffs, as well as his views regarding Plaintiffs' business practices, products, and industry conduct. To the extent Plaintiffs dispute certain details, any such differences are immaterial and do not alter the substance, gist, or sting of the statements. Because falsity is a required element of Plaintiffs' defamation-based claims, the absence of materially false statements defeats those claims.

**Affirmative Defense No. 2: Opinion**

The alleged statements constitute non-actionable opinion, interpretation, and/or rhetorical commentary. Many of the statements identified in the Amended Complaint, particularly those made on social media platforms and public forums, reflect Defendant's subjective views regarding product quality, business decisions, employee treatment, and his perceived role in the company. In context, a reasonable reader would not interpret such statements as objective, verifiable facts, but rather as opinion, advocacy, or personal perspective. Accordingly, such statements are not actionable.

**Affirmative Defense No. 3: No Pre-Suit Notice**

Plaintiffs' defamation and libel-based claims are barred, in whole or in part, because Plaintiffs failed to comply with the pre-suit notice requirements

of Florida Statutes § 770.01 as to many of the statements alleged in the Amended Complaint. Plaintiffs' notice did not encompass numerous statements now relied upon in this action, and Plaintiffs therefore cannot recover based on those statements.

**Affirmative Defense No. 4: No Causation or Damages**

Plaintiffs cannot establish that any alleged statement by Defendant proximately caused any legally cognizable damages. The Amended Complaint relies on generalized allegations of reputational harm and speculative assertions regarding business relationships, without identifying concrete, non-speculative losses attributable to specific statements. Any alleged harm is remote, contingent, or attributable to factors other than Defendant's statements.

**Affirmative Defense No. 5: No Special Damages**

Plaintiffs' claim for business disparagement fails because Plaintiffs have not pleaded and cannot prove special damages with the specificity required under Florida law. Plaintiffs do not identify specific lost customers, transactions, or quantifiable losses attributable to any particular statement and therefore cannot recover on that claim.

**Affirmative Defense No. 6: Equitable Estoppel**

For years, Plaintiffs acknowledged Defendant's "Co-Founder" status and inventorship. Defendant relied on such acknowledgement to build his

professional identity. Plaintiffs cannot now flip their position and claim those same titles are “defamatory” or “false."

**Affirmative Defense No. 7: Justification/Privilege**

Defendant’s alleged statements to third parties do not constitute tortious interference because the statements were justified and/or privileged.

**Affirmative Defense No. 8: Unclean Hands**

Plaintiffs’ claims are barred by the doctrine of unclean hands.

**Affirmative Defense No. 9: Lack of Standing**

To the extent Plaintiffs assert claims based on Defendant’s alleged statements concerning non-party Dan Liu, Plaintiffs lack standing for such claims.

**Affirmative Defense No. 10: Statute of Limitations**

Plaintiffs’ claim for breach of contract is barred by the statute of limitations.

## COUNTERCLAIM

Defendant/Counter-Claimant, Eddy JD Olivares II (“Olivares”) hereby sues Plaintiff/Counter-Defendants Hytto Pte. Ltd and Danxiao Information Technology, Ltd. (collectively, “Lovense”), and alleges:

## PARTIES, JURISDICTION AND VENUE

1. Olivares is an individual residing in Fort Myers, Florida. Olivares was employed by Danxiao Information Technology, Ltd. from 2014 through 2017.

2. Upon information and belief, Hytto Pte. Ltd. ("Hytto") is a corporation organized under the laws of Singapore, with its principal place of business in Singapore, and is the owner of the Lovense brand and its related intellectual property, and has conducted substantial business in the United States, including through its former U.S. subsidiary, Hytto, Inc.

3. Upon information and belief, Danxiao Information Technology Ltd. ("Danxiao") is a foreign entity that, upon information and belief, operates in coordination with Hytto to develop, manufacture, and commercialize Lovense products, and has directed the conduct giving rise to the claims asserted herein.

4. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs. Additionally, there is federal-question jurisdiction for the correction of inventorship claims

asserted hereinbelow under 28 U.S.C. §§ 1331 and 1338(a) because those claims arise under the Patent Act, 35 U.S.C. § 1 et seq.

5. Personal jurisdiction is proper because Lovense has purposefully availed themselves of this forum, directed substantial business activities toward the United States and the State of Florida (including employing Olivares), engaged in commercial activities within this District, and committed acts giving rise to these counterclaims in this forum.

6. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these counterclaims occurred within this District and Lovense is subject to personal jurisdiction here. Additionally, venue is proper in this District for the correction of inventorship claims pursuant to 28 U.S.C. § 1391 and § 1400(b).

**GENERAL ALLEGATIONS**

7. On or about 2014, Olivares began working for Lovense in a marketing capacity.

8. Shortly after joining Lovense, Olivares became deeply involved in the development, design, and commercialization of multiple products associated with Lovense.

9. During his tenure, Olivares contributed to the conception and development of several products and is listed as an inventor on multiple

United States patents, including but not limited to U.S. Patent Nos. 9,762,515, 9,737,458, 9,889,064, and 10,051,328. Olivares was involved in the development of related design patents as well.

10. As Olivares' role expanded, Lovense and Dan Liu (the CEO of Lovense), represented to Olivares that he was a founding-level contributor to the business and authorized Olivares to present himself as a "co-founder" in communications and interactions with distributors, partners, third-parties, and the market as a whole.

11. Lovense's representations concerning Olivares' role as a "co-founder" were made in the context of inducing Olivares to continue contributing to the growth of the company, including the development of products, intellectual property, and market strategy.

12. On or about December 2015, Lovense offered Olivares an equity arrangement, further reinforcing the understanding that Olivares' role and contributions would be recognized through ownership participation.

13. Lovense represented the equity agreement as the sole and exclusive instrument governing the relationship and concealed the existence of shadow agreements Lovense had drafted to mislead Chinese government authorities and created a pretext for later denying Olivares his contractual rights.

14. Olivares relied on Lovense's representations and continued to devote substantial time, effort, and intellectual contributions to the business, including contributions that formed the basis of commercially successful products and patented technologies.

15. In 2017, however, Lovense terminated Olivares' relationship with the company under pretextual circumstances that prevented him from realizing the total consideration used to induce his patent assignments including promised equity, long term employment, bonuses tied to product sales, co-control over the commercialization of his patented technologies, and recognition.

16. Following his departure, a dispute arose regarding Olivares' role, contributions, and rights, including his status within the company and his relationship to the underlying intellectual property.

17. On or about 2024, Olivares became aware that Lovense had begun taking steps to deny and erase Olivares' role as a "co-founder," including disputing his status as such and minimizing or denying his contributions to product development and innovation.

18. Around the same time, in response to Olivares' Notice of Dispute, Lovense separated his equity and patent rights into distinct *buckets* and fully denied any of his original patent rights for the first time.

19. Lovense communicated with third parties, including media outlets and industry participants, to alter or remove references to Olivares' role and contributions as a "co-founder."

20. These efforts included pressuring or inducing publications to modify previously published materials that accurately reflected Olivares' involvement in the company's development and success.

21. As a result of these actions, Olivares' professional reputation, particularly as an inventor and founding-level contributor in his industry, has been damaged.

22. On or around 2025, Olivares became aware that Lovense forged and concealed employment agreements used to obtain Olivares' 2015 to 2017 work visa and resident permits to enable continued employment.

23. In 2025, the unknown terms of the concealed agreements were used as the basis for denying Olivares his equity rights in a parallel arbitral proceeding. In that arbitral proceeding, Lovense revealed their original intent to limit Olivares' participation in equity ownership of Danxiao, which is a shell, with no revenue generating assets. It was also revealed that officers and representatives, Dan Liu and Huiyun Su, who declare themselves as 100% owners of Lovense in the equity agreement, were in fact, not the sole owners.

24. Olivares reasonably and justifiably relied on the representations made in the equity agreement, including the provisions which state that unilateral termination was not possible and that the agreement had a long-term binding effect.

25. Lovense's representations regarding the entities involved in equity participation and the shareholding ownership of the Lovense brand were also relied upon.

26. Lovense induced Olivares to assign patents to Shenzhen Aigan Technology Co. Ltd, an entity Lovense now claims is separate from the entities in which Olivares was given equity in the equity agreement, i.e., Lovense led Olivares to believe that the entity he was receiving equity in was the same entity he assigned his patents to—it was not.

27. Despite appropriating foundational patents of Lovense and retroactively asserting that the foundational patents are "service inventions" under Chinese law, Lovense has failed to provide Olivares with any statutory remuneration or contractual equity.

28. To date, Olivares has not received any remuneration for his intellectual property and co-founder services, resulting in a lack of consideration in the patent assignments. Olivares has also suffered economic harm, including lost opportunities to leverage his experience,

reputation, and intellectual property in connection with business ventures, licensing opportunities, and professional engagements.

29. Lovense's active efforts to "scrub" the historical record and their recent admissions in a parallel arbitral proceeding confirm a sustained campaign of fraudulent concealment that prevented Olivares from discovering the true nature of his injury until late 2024, and into 2025.

30. Prior to Olivares' involvement, Lovense had no prior patents or patent strategy. Olivares initiated the patent protection strategy and personally fronted the initial filing costs of some applications to secure the brand's future, acting as a co-founder protecting company assets. While he was later reimbursed for these administrative fees, he received no remuneration for the value of the intellectual property itself, which was transferred solely in reliance on promises of equity participation, bonuses, recognition and other long-term benefits.

31. The intellectual property assets of Lovense were rightfully Olivares' personal property, and his subsequent assignment of these rights was solely induced by the Counter-Defendants' fraudulent promises.

32. The key technology (U.S. Patent No. 9,762,515) conceptualized and assigned by Olivares serves as the primary driver of consumer demand for the Lovense brand. This technology facilitates a massive

global ecosystem, integrated with thousands of daily live-streams that serve as the brand's primary marketing engine, creating an incredibly lucrative market value for the products that is inextricably linked to Olivares' foundational intellectual property.

33. Counter-Defendants utilized the patent application process as a deceptive tool to misappropriate Olivares' intellectual property while secretly intending to repudiate his inventorship and equity rights once the legal title was secured.

34. Because the patent assignments were obtained through fraud and abuse of a confidential relationship, the Counter-Defendants hold the legal title to the patents and the profits derived therefrom as trustees ex maleficio (wrongful trustees) for the benefit of Olivares.

35. Counter-Defendants have commingled the profits derived from Olivares' inventions with their general revenue, creating a unified stream of ill-gotten gains. Olivares is entitled to an accounting and a constructive trust over the total revenue derived from any product utilizing U.S. Patent No. 9,762,515, the foundational technology.

## **COUNT I: FRAUDULENT INDUCEMENT**

36. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

37. Lovense, through its officers and/or other representatives, made material representations to Olivares concerning the nature of his role and relationship with the company, including representations that he would be treated as a founding-level participant, that he was authorized to hold himself out as a "co-founder" in dealings with third parties, and that his contributions would be recognized through substantial equity participation in the unified global Lovense brand and enterprise, which is comprised of all entities listed in the Equity Incentive Plan.

38. These representations were false when made, or were made without any present intent to perform, as Lovense did not intend to provide Olivares with the status, recognition, employee rights, employee protections, or equity participation that was represented to him.

39. Lovense made these representations with the intent that Olivares rely upon them and continue contributing to the company's development, including through product innovation, intellectual property creation, and market expansion.

40. Olivares reasonably and justifiably relied on these representations by remaining with the company, contributing to the development and commercialization of products, participating in the creation of intellectual property, and foregoing other professional and economic opportunities.

41. Lovense subsequently acted inconsistent with their representations by terminating Olivares' relationship with the company on pretextual grounds and denying him the total consideration used to induce his patent assignments including promised equity participation, long term employment, bonuses tied to sales growth, co-control over the commercialization of his patented technologies and recognition.

42. As a direct and proximate result of Lovense's fraudulent inducement, Olivares has suffered damages, including lost equity value, lost compensation, and the loss of economic benefits associated with his contributions.

**COUNT II: FRAUDULENT CONCEALMENT**

43. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

44. Lovense concealed material facts from Olivares that were necessary to make an informed decision. *I.e.,* Material Omissions.

45. Lovense failed to disclose that the unilateral addition of the employment conditions in the Equity Incentive Plan could be unilaterally invoked to deny Olivares his rights under the Equity Incentive Plan, despite the absence of any executed labor contract governing such employment status.

46. Lovense also failed to disclose that Olivares' inventions constituted "service inventions" under Chinese law in order to assert that the company possessed sole ownership of those inventions—which was false.

47. Lovense also failed to disclose that Olivares was assigning patents to a different Lovense subsidiary than the one in which he would get equity in.

48. These material facts were concealed from Olivares at the time Olivares executed the Patent Assignments and were only asserted in November 2024 after Olivares sent Lovense a notice of dispute regarding his equity rights.

49. Lovense had a duty to disclose these material facts because they possessed superior knowledge concerning the corporate structure, legal characterization of Olivares' role, and their intended use of his intellectual property rights, while simultaneously inducing Olivares to transfer those rights through patent assignments.

50. By concealing these material facts while actively inducing Olivares to execute the patent assignments, Lovense prevented Olivares from discovering the true nature of the transaction and the absence of the promised equity participation.

**COUNT III: UNJUST ENRICHMENT**

51. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

52. Between 2014 and 2017, Olivares conferred a substantial benefit upon Lovense by conceptualizing and directing the foundational product innovations, technical requirements, and branding strategies that resulted in the global commercial success of the Lovense brand.

53. Specifically, Olivares provided Lovense with the ownership of several foundational patents (including but not limited to U.S. Patent Nos. 9,762,515; 9,737,458; 9,889,064; and 10,051,328) and grew the brand from its inception to a multi-million-dollar international enterprise.

54. Lovense had knowledge of these benefits, actively induced them through promises of equity participation, and have voluntarily accepted and retained these benefits.

55. Lovense continued to generate substantial revenue and maintain competitive market dominance through the use of Olivares' inventions and his efforts in establishing the brand's global distribution and marketing infrastructure.

56. Under the circumstances, it would be inequitable and manifestly unjust for Lovense to retain the value of these foundational assets and

commercial growth without paying Olivares the fair value of his contributions.

57. Olivares has suffered damages in an amount to be proven at trial, representing the value of the benefits conferred upon Lovense for which he has received no remuneration.

**COUNT IV: CORRECTION OF INVENTORSHIP**
**(U.S. PATENT NO. 11,737,948)**

58. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

59. Olivares is an actual inventor of U.S. Patent No. 11,737,948.

60. The assignee of U.S. Patent No. 11,737,948, Hytto, knew or should have known of Olivares' contribution to the patent.

61. The omission of Olivares as a named inventor is not the result of any deceptive intent on his part.

62. Olivares has suffered financial and reputational harm due to the omission.

63. Under 35 U.S.C. § 256, this Court has the authority to order the Director of the USPTO to issue a certificate of correction changing the inventorship of U.S. Patent No. 11,737,948.

**COUNT V: CORRECTION OF INVENTORSHIP (U.S. PATENT NO. 12,318,340)**

64. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

65. Olivares is an actual inventor of U.S. Patent No. 12,318,340.

66. The assignee of U.S. Patent No. 12,318,340, Hytto, knew or should have known of Olivares' contribution to the patent.

67. The omission of Olivares as a named inventor is not the result of any deceptive intent on his part.

68. Olivares has suffered financial and reputational harm due to the omission.

69. Under 35 U.S.C. § 256, this Court has the authority to order the Director of the USPTO to issue a certificate of correction changing the inventorship of U.S. Patent No. 12,318,340.

**COUNT VI: CORRECTION OF INVENTORSHIP (U.S. PATENT NO. 12,539,248)**

70. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

71. Olivares is an actual inventor of U.S. Patent No. 12,539,248.

72. The assignee of U.S. Patent No. 12,539,248, Hytto, knew or should have known of Olivares' contribution to the patent.

73. The omission of Olivares as a named inventor is not the result of any deceptive intent on his part.

74. Olivares has suffered financial and reputational harm due to the omission.

75. Under 35 U.S.C. § 256, this Court has the authority to order the Director of the USPTO to issue a certificate of correction changing the inventorship of U.S. Patent No. 12,539,248.

**COUNT VII: CORRECTION OF INVENTORSHIP (U.S. PATENT NO. D1,047,209)**

76. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

77. Olivares is an actual inventor of U.S. Patent No. D1,047,209.

78. The assignee of U.S. Patent No. D1,047,209, Hytto, knew or should have known of Olivares' contribution to the patent.

79. The omission of Olivares as a named inventor is not the result of any deceptive intent on his part.

80. Olivares has suffered financial and reputational harm due to the omission.

81. Under 35 U.S.C. § 256, this Court has the authority to order the Director of the USPTO to issue a certificate of correction changing the inventorship of U.S. Patent No. D1,047,209.

## COUNT VIII: CORRECTION OF INVENTORSHIP (U.S. PATENT NO. D948,069)

82. Olivares reincorporates and realleges paragraphs 1 - 35 as if fully set forth herein.

83. Olivares is an actual inventor of U.S. Patent No. D948,069.

84. The assignee of U.S. Patent No. D948,069, Danxiao, knew or should have known of Olivares' contribution to the patent.

85. The omission of Olivares as a named inventor is not the result of any deceptive intent on his part.

86. Olivares has suffered financial and reputational harm due to the omission.

87. Under 35 U.S.C. § 256, this Court has the authority to order the Director of the USPTO to issue a certificate of correction changing the inventorship of U.S. Patent No. D948,069.

## PRAYER FOR RELIEF

**WHEREFORE**, Olivares seeks Judgment:

(a) Awarding compensatory damages in an amount to be proven at trial;

(b) Rescinding the patent assignments from Olivares and ordering the correction of the records of the USPTO to restore Olivares' legal and equitable ownership of the intellectual property at issue;

(c) Ordering an accounting and the imposition of a constructive trust over the total revenue derived by Lovense from any products utilizing U.S. Patent No. 9,762,515, the foundational technology, and the other Lovense patents invented by Olivares;

(d) Disgorgement of all profits and ill-gotten gains derived by Counter-Defendants from their fraudulent acquisition and use of Olivares' intellectual property;

(e) Ordering that Olivares be added as an inventor on U.S. Patent No. 11,737,948; U.S. Patent No. 12,318,340; U.S. Patent No. 12,539,248; U.S. Patent No. D1,047,209; and U.S. Patent No. D948,069.

(f) Ordering the Director of the USPTO to issue certificates of correction changing the inventorship of U.S. Patent No. 11,737,948; U.S. Patent No. 12,318,340; U.S. Patent No. 12,539,248; U.S. Patent No. D1,047,209; and U.S. Patent No. D948,069.

(g) Awarding punitive damages;

(h) Awarding reasonable attorneys' fees and costs; and

(i) Awarding such other and further relief the Court deems just and proper.

## JURY TRIAL DEMAND

Defendant/Counter-Claimant demands a trial by jury on all issues so triable.

Dated: April 20, 2026

Respectfully submitted,

By: */s/John C. Carey*
John C. Carey (FBN 78379)
Email:
jcarey@careyrodriguez.com
Ethan B. Rodriguez (FBN
1036022) Email:
erodriguez@careyrodriguez.com
**CAREY RODRIGUEZ LLP**
121 Alhambra Plaza, Suite 1000
Coral Gables, Florida 33134
Tel: 305.356.5455
Fax: 305.372.7475